## BRANTLEY *vs.* WEST.

[BILL IN EQUITY TO HAVE ABSOLUTE SALE HELD A TRUST OR MORTGAGE.]

1. *Variance between allegations and proof.*—Where the bill alleged a single contract, by which complainant transferred six slaves to defendant, in consideration that he should pay all the just debts of complainant; while the proof showed that there were two contracts, made on different days, and that defendant promised to pay only those debts which were then in execution,— *held*, that the bill was properly dismissed on account of the variance.

2. *Fraudulent contract cannot be established in equity.*—Equity will not interfere to declare a contract, which is on its face an absolute sale, to be a trust or mortgage, when the evidence shows that the transaction was intended to defraud the vendor's creditors. *In pari delicto, potior est conditio possidentis.*

3. *Sufficiency of parol evidence to convert written contract of sale into trust or mortgage.* Where a party seeks relief in equity in the face of a written instrument, asking that an absolute sale may be held a trust or mortgage, he must establish his case by clear and convincing proof. It is not sufficient to raise a doubt, or suspicion, whether the writing expresses the true contract of the parties ; nor is proof by several witnesses of defendant's subsequent declarations, which are not charged in the bill, sufficient to outweigh the positive denial of his answer under oath, the writing itself, and the testimony of the subscribing witness.

APPEAL from the Chancery Court of Dallas.

Heard before the Hon. JAMES B. CLARK.

THIS bill was filed by Jonathan S. Brantley against James West, and alleged these facts : That in April, 1846, complainant, being possessed of six slaves, an undivided interest in certain real estate lying in Wilcox county, and some other personal property, and having fallen into intemperate habits, by which his physical and mental powers were greatly enfeebled and impaired, and his pecuniary circumstances greatly

embarrassed, was induced by the earnest solicitations of the defendant, who was his brother-in-law, to enter into a verbal agreement with him, by which complainant hoped to relieve himself of his embarrassments, pay his just debts, and preserve his negroes. This agreement is thus stated in the bill : "That he, the said James West, might take into his possession all the property of your orator, and should pay all the just debts of your orator ; and when this was accomplished, and the labor of the said negroes should, at a fair and reasonable rate, amount to a sum sufficient to remunerate said West for the sums applied to the payment of your orator's debts, and a just and fair compensation to the said West for his trouble and expenses in the adjustment of the affairs and business of your orator, he, the said James West, would restore to your orator the said negro slaves." The bill alleges, that on the 11th April, 1846, by virtue of said verbal agreement, said West went into the possession of the six slaves, one horse, one mule, about three hundred bushels of corn, and three thousand pounds of fodder, for all of which articles he was to account to complainant at a fair and reasonable price ; that complainant, at the earnest solicitations of said West, also suffered his undivided interest in said lands to be sold, and the proceeds (the exact amount of which he cannot state) went into the hands of said West, to be applied to the payment of complainant's debts.

The bill further alleges, that some time after West thus obtained the possession of said slaves and other property, and while complainant was still laboring under the same physical and mental imbecility, and had the utmost confidence in the honesty and friendship of said West, complainant was induced to make to said West an absolute bill of sale of the said slaves, upon the positive declarations and assurances of said West that he would honestly and faithfully carry out and perform his original undertaking and agreement with complainant, to restore him the said slaves when he had retained them for a time sufficiently long to make their labor, at a fair valuation, amount to a sum sufficient to remunerate said West for all sums which he might pay for complainant, and the necessary trouble and expense he might incur ; that at the time this bill of sale was executed, said West paid to complainant .

the sum of $900, which complainant paid back to him on the same day, and said West has never repaid it, nor any part of it; that in the month of September in the same year, and while complainant was still in the same state of mental and physical imbecility, said West obtained from him, without any other consideration, another written instrument in reference to said slaves, the exact nature of which complainant does not recollect, but believes it was some receipt for the price, or a bill of sale for the said slaves. The bill then alleges, that the slaves, with the other property conveyed to said West, were at that time worth much more than the amount of all complainant's debts; that West has not complied with his agreement, and has not paid more than from $1,200 to $1,400 for complainant, leaving a large number of his debts unpaid; that the hire of the slaves since they went into West's possession, and the proceeds of the sale of the other property received by him, are more than sufficient to remunerate him for all the money that he has expended for complainant, as well as reasonable compensation for his trouble and services; and that he now refuses to restore the slaves. The prayer of the bill is for an injunction to prevent the removal of the slaves, and a discovery and account; that West be decreed to pay over to complainant whatever balance may be found due him on the stating of the account; that he be held to restore said slaves to complainant; and for general relief.

The defendant answered the bill, and denied all its material averments, except the fact that complainant, in April, 1846, was greatly embarrassed in his pecuniary circumstances, and was addicted to intemperate habits, though his mental capacity was not then at all impaired. He states that, previously to April, 1846, as administrator of J. A. Brantley, deceased, he had obtained a judgment against complainant, on which execution was issued, and levied on complainant's lands in Wilcox county; that he became the purchaser at the sheriff's sale, at the price of $400, which was not enough to satisfy the execution; that other judgments were obtained against complainant about the same time, on some of which executions were issued, which equaled (if they did not exceed) the entire value of his property; that under these circumstances, respondent, being willing to assist complainant, and to prevent

his negroes from being sacrificed at sheriff's sale, purchased from complainant, on the 8th April, 1846, one of the negroes mentioned in the bill, at the price of $500, and took from him a bill of sale; that on the next day he also purchased from complainant the other five negroes mentioned in the bill, with two horses and one mule; that the contract between himself and complainant was, that respondent should purchase the slaves and other property absolutely, at a specified price for each, amounting in the aggregate to $2,690; that respondent, on his part, stipulated and agreed to pay off all the judgments against complainant which had acquired a lien on the prop·erty, the exact amount of which was not then known to them, and to pay the balance of said $2,690 in cash; that respondent then paid to complainant $800, the estimated difference between the amount of said judgments and the price of said property, and it was agreed that the exact balance should be adjusted so soon as the amount of the judgments was definitely ascertained, by either party paying the balance against him.

Respondent annexes, as exhibits to his answer, the bills of sale above described, which exactly correspond with his description of them; and at the foot of the second is this agreement: "It is agreed between the parties, that James West is to pay and satisfy sundry writs of execution, now in the hands of, and levied by, the proper officer, against the said J. S. Brantley, and no others." Respondent further denies that any portion of said $800 was repaid to him by complainant; alleges that said contract was, and was intended to be, an absolute sale; admits that he afterwards volunteered to let complainant have his slaves back again at the same price, upon his repayment of the moneys expended for him by respondent, which complainant failed to comply with; alleges that he "has paid and satisfied judgments and executions against complainant, besides other debts, to an amount exceeding the said estimated value of said property; and appends to his answer, as an exhibit, a statement of the debts which he has thus paid, amounting to about $1,320, but marked "incomplete."

On the part of the complainant, John E. Brantley, E. H. Cook, J. W. Hudson, and L. W. McMillan, were examined as witnesses; and on the part of the defendant, beside said

35

Cook and McMillan, H. P. Heath, Robert Heath, T. M. Jackson, Nelson Taylor, and Samuel West. The testimony of these witnesses, in brief, may be thus stated :

*John E. Brantley* states, that complainant's mind was impaired by his intemperate habits in 1845–6 ; and he was not competent to manage his affairs with prudence. Was present at the sale of Lucy by said Brantley to West ;—" the conduct of West manifested a desire to transact the matter privately" ;—" told both the parties I thought it was swindling." Has heard West say, on several occasions (dates not recollected), that he had sold Brantley's land for $1,200, and that he intended to pay it over to Brantley. Has always believed that West had Brantley's property, and had never paid him for it. Has often told West this ; who sometimes replied that he had paid for it, at other times would not say anything, and then again said ' it was none of witness' business'. West told witness, in the spring of 1848, that he owed Brantley $1,200 for the land. At the time when the sale of Lucy took place, " both parties acted very strange, like they were disposed to do something wrong." Witness told them it was a swindling operation ; but West afterwards explained to witness that Brantley gave the negro girl to West for the land. " Complainant went to West, and told him that he would go to his brother Jesse, in Louisiana, and get him to come and redeem his property ; and West told him that he would never give them up to anybody but him." Brantley's debts amounted to $1,500 or $1,600, of which from $1,200 to $1,400 were in judgment.

*E. H. Cook* was at the house of John E. Brantley, in April, 1846, when West requested him to walk into a back room, where he found complainant. Was requested by them to write a bill of sale for a negro, which he did ; and the first bill of sale appended to the answer is in his handwriting. Does not recollect the conversation which took place between the parties, but thought from the mystery and secrecy with which the transaction was conducted that there was something wrong. Saw no money paid, but a due bill for $30 or $40 passed from West to Brantley. Brantley was not under the influence of liquor at the time. On leaving the room, told John Brantley his impression that something wrong was

going on in his house; whereupon Brantley, much excited, walked into the room, swearing that he would stand no such transactions, as he was bound as surety for complainant; and West then told him he should lose nothing by complainant, and promised to secure him against all the debts. Had a conversation with West, in 1848, in which West told him that he saw Brantley was squandering his property, and that he had taken charge of it; and also consented that witness should make a settlement between him and Brantley on the following conditions: "That at the time he took the property, the understanding was, that he was to pay Brantley's debts, and furnish him with the means to support his family, and was to allow him the hire for his negroes; and whenever the hire of the negroes liquidated the debts, be the time long or short, Brantley was to have his property back."

*McMillan* proves Brantley's intemperate habits, and consequent incapacity, when drunk, to make a prudent bargain; and states that he knows, from information derived from both parties, that West bought certain negroes and other property from Brantley some time in April, 1846.

*Hudson*, in the early part of the year 1846, had an execution in his hands against Brantley, and was referred by him to West, who (B. said) would satisfy it. Called on West, who stated that he had already assumed more of Brantley's debts than he agreed to pay when he took the property; that he intended to sell all the property but the negroes, and that he wished to save them for Brantley; that it would take him two or three years to pay the debts which he had assumed, and then Brantley would get his property again. Brantley was very intemperate, and was not capable of attending to his own business when drunk; his mind was impaired.

*Nelson Taylor* was the subscribing witness to the bill of sale for the five slaves, and states that the contract was as follows: "West was to pay Brantley $800 in cash, and was to take up certain executions held against Brantley at the time"; and borrowed some $375 from witness to pay it. Looked upon the trade as made in good faith, and for a full consideration. Brantley was sober at the time.

*Samuel West* was not present at the trade, but both the parties told him about it on the next day, and stated the con-

tract as follows : "Defendant purchased from complainant five negroes, upon consideration that defendant pay and satisfy certain executions which were then hanging over the negroes, and pay complainant in addition $800." Complainant was much embarrassed at the time of the sale, and his negroes would soon have been sold by the sheriff, if he had not sold them himself. The price was fully as much as they would have brought at sheriff's sale. Has heard defendant frequently, since that time, offer to let complainant have his negroes again, if he would refund the amount paid out for him. States, also, that two days before said contract was made, complainant came to him, and proposed that he should run off his negroes to avoid the payment of his debts.

*T. M. Jackson* testifies to declarations made to him by both Brantley and West, in effect, " that the sale of the slaves was absolute, but Brantley had the privilege of redeeming, or taking them back, whenever he refunded the amount paid him by West"; that West agreed to pay a certain amount in money, and also to pay off all the judgments against Brantley.

The other witnesses testify to no material facts.

The chancellor dismissed the bill, because of a variance between the allegations and proof; and his decree is now assigned for error.

J. H. CAMPBELL and WM. M. BYRD, for the appellant :

1. The testimony clearly establishes a secret trust, and thus disproves the answer ; and the answer, being disproved as to this leading fact, is not to be regarded as evidence for any purpose, but is to be taken merely as a plea.—Pharis v. Leachman, 20 Ala. 662; Gunn v. Brantley, 21 *ib.* 633.

2. The case made by the bill is substantially sustained by the proof; and though the proof may go beyond the allegations of the bill, that affords no reason why relief should not be granted to the extent of the allegations. To hold a party to strict proof of a secret trust, according to his allegations of its terms, would be requiring more than is ordinarily possible ; and the rule only requires that the allegations should be substantially proved.—Story's Equity Pleadings, § 264; Daniell's Chancery Practice, 997; 4 Stew. & P. 318. The rule as to variance only applies where the evidence discloses

Brantley v. West.

a case for relief different from that set up by the pleadings. Gilchrist v. Gilmore, 9 Ala. 985 ; English v. Lane, 1 Port. 328; 5 Stew. & P. 67.

3. The proof establishes the fact that the bill of sale was intended as a mortgage.—1 Port. 328; 5 Stew. & P. 67.

4. The chancellor's decree cannot be sustained on the ground that the transaction was intended to defraud creditors. A mortgage by a debtor to secure one or more debts is no evidence of fraud. At the time this contract was entered into, a debtor had the right to prefer one creditor. West did not feel himself restricted to the payment of any particular class of debts : on the contrary, he alleges that he paid, "judgments, executions, and other debts"; and he declared to the witness Cook that he had assumed " to pay the debts of Brantley."

Geo. W. Gayle, *contra*, made the following points :—

1. The contract between the parties was an absolute sale, and not a trust or mortgage. This is shown by the answer, and by the testimony of Samuel West and Nelson Taylor. The answer, being responsive, must be disproved by two witnesses, or by one witness with strong corroborating circumstances.—Hogan v. Smith, 16 Ala. 600. Strong proof is required to establish fraud against the positive denial of the answer ;—proof of the defendant's admissions merely is not sufficient to overthrow the positive denial of his sworn answer, supported by corroborative evidence.—Hope v. Evans, 1 Sm. & Mar. Ch. 195; 1 U. S. Equity Digest, §§ 325, 331, p. 443. The defendant's admissions, not being put in issue by the bill, were improperly admitted in evidence.—Brandon v. Cabiness, 10 Ala. 156.

2. There is a fatal variance between the allegations and proof.—Paulding v. Lee & Ivey, 20 Ala. 754; Adams v. Garrett, 22 *ib*. 602; Freeman v. Swan, *ib*. 106.

3. The bill of sale, being perfect and complete within itself, cannot be contradicted or varied by parol proof.—West v. Kelly's Heirs, 19 Ala. 353; Ware v. Cowles, 24 *ib*. 446.

4. If the contract was not an honest and absolute sale, it was fraudulent ; and equity, therefore, will not interfere. 1 Story's Equity, § 61. For proof of fraud, see the allegation

of the bill, that "West paid $900, which was returned to him on the same day"; the evidence of Samuel West, that, "two days before the trade, complainant proposed to run his negroes, to avoid his debts"; the addendum to the bill of sale, which requires West to pay "debts in execution, and no others"; Cook's evidence, that "he thought there was something wrong"; and John E. Brantley's evidence, that "both acted very strangely, and looked like they were both doing wrong", and that he "told them it was a swindling operation."

CHILTON, C. J.—The general rule is, that no relief can be granted upon matters not charged in the bill, although the same may appear in proof, for the decree must be predicated upon the allegations and the proof. This rule is founded upon the substantial reason, that the bill, by its allegations, ought to apprise the defendant of what he is expected to meet and defend against. If a contract materially different from that set up in the bill might be proved, and a decree rendered upon such proof, the defendant would often be taken by surprise, and be denied the privilege of making his defence. Indeed, all proof outside of the allegations of the bill is irrelevant and improper.—Story's Eq. Pl. § 257; McKinley v. Irvine, 13 Ala. 693–4, and cases there cited.

In the case before us, the contract charged in the bill is as follows: "That, he, the said James West, might take into his possession all the property of the complainant, and should pay all the just debts of said complainant; and when this was accomplished, and the labor of complainant's negroes should, at a fair and reasonable rate, amount to a sum sufficient to remunerate said West for the sums applied to the payment of the said debts, and a just and fair compensation to said West for his trouble and expenses in the adjustment of the affairs and business of complainant, then the said James West would restore to the complainant the said negro slaves." After averring that West went into possession of six slaves, a horse, a mule, three hundred bushels of corn, and three thousand pounds of fodder, it is stated, that "said James West was to account for them at a fair and reasonable price."

It is then averred that, some time after West came to the

possession of the said property, he induced complainant to make to him an absolute bill of sale to said negroes, " upon the positive declarations and assurances of the said James West, that he would honestly and faithfully carry out and perform his original undertaking and agreement with complainant, to restore him the said slaves when he had retained them for a time sufficiently long for their labor, at a fair valuation, to amount to a sum sufficient to remunerate the said James West for all sums which he might pay for said complainant, and the necessary trouble and expense he might incur."

It is averred, also, that at the time of the execution of the bill of sale, complainant received of West the sum of nine hundred dollars, but paid it back to him on the same day, and it has never been refunded.

The answer positively denies that the bill of sale was designed as a mortgage, but insists that it really was, what it appears on its face to be, an unconditional transfer of the property to the defendant. And upon a close inspection of the proof, not a single witness proves the contract as charged.

Upon this ground, the chancellor dismissed the bill; and, we think, properly.

But we think he might have refusd the relief prayed upon the merits. Assuming that there was a secret trust existing in favor of Brantley, we cannot resist the conclusion, that such trust was designed as a scheme to defraud his creditors. This is clearly inferable from the circumstances in proof. The complainant says in his bill, he received nine hundred dollars at the time of the execution of the bill of sale, and on the same day handed it back to the vendee. Why this was done he does not inform us. Neither is any motive shown for making the transfer absolute, when a trust or mortgage was intended, unless it be to deceive creditors who had not acquired leins upon the property. Again ; why limit the payments to be made by West to debts which were in execution, excluding expressly all others, as was done by the writing superadded at the bottom of the bill of sale, unless the object was to exclude all but such creditors as had a lien on the property which would override the sale, and thus save to the insolvent debtor the surplus? These circumstances, connected with the facts that, only two days before the sale, Brantley

proposed to run his negroes to avoid his debts, as proven by Samuel West, and the secret manner in which they entered into the arrangement, even deceiving the subscribing witness into the belief that the transaction was an absolute sale and *bona fide*, very clearly show that the object was to defraud creditors. In such cases, courts both of law and equity leave parties to the consequences of their fraud. The maxim applies, "*In pari delicto, melior est conditio possidentis.*"—Addams' Equity, 175; 1 Story's Equity, § 61.

If, however, the decree of the chancellor could not be maintained upon either of the foregoing grounds, we are satisfied that, upon well-settled principles, the proof is wholly insufficient to justify the court in reforming this instrument, or decreeing it to be a trust or mortgage. When a party prays relief in the very face of a written contract, upon the ground that such writing does not truly speak the meaning and intention and true agreement designed to be entered into between them, he must clearly bring himself within the exception to the general rule which gives the preference to written over parol evidence. He must establish, by clear and convincing proof, that the instrument, although absolute upon its face, was designed as a security merely. It is not sufficient to raise a suspicion, or doubt, as to whether the instrument which the parties have adopted as the evidence of their agreement, correctly states the contract. The court must be satisfied, by at least a clear preponderance of proof, that a mortgage, and not an absolute sale, was intended.—Vanmetre v. McFaddin, 8 B. Mon. 438; Jenison v. Graves, 2 Blackf. 440; Elliott v. Armstrong, *ib.* 198; Chapman & Wife v. Hughes, 14 Ala. 218; Bryant & McPhail v. Cowart, 21 *ib.* 91–98.

I think it was very unfortunate that the courts of chancery ever so far relaxed the rule, as, in the absence of fraud or mistake in the execution of written instruments, to permit a complainant, in opposition to the denial of the defendant's answer, to prove by parol an absolute deed to be but a security, or an assignment in trust. It was, in my humble conception, an innovation fraught with dangerous consequences, and one which tends greatly to destroy the value of the salutary rule, which declares the writing itself to be the best evidence of what the parties intended should be the final and

binding contract between them, where nothing has been left out of the agreement by fraud or mistake, which either party supposed was inserted in it when executed. But to recede now, after so many decisions of this court, would unsettle the law, and disturb existing titles. When, however, parol proof is allowed to control written instruments, it must be clear and satisfactory.

Such is not the character of the proof in the case before us. On the one side, there is the absolute bill of sale, expressed in clear and explicit language,—the sworn denial of the defendant that it was intended to operate as a security or mortgage, and this denial substantially sustained by the subscribing witness to the instrument, Mr. Nelson Taylor, and by Samuel West; whereas the opposing proof consists of declarations of the defendant, as shown by two or three witnesses, which declarations were not charged in the bill, so as to afford the defendant the opportunity of meeting and explaining them,—are, at best, easily misunderstood, and liable to be perverted from their true meaning. It were needless to set out the proof in this place, as it will appear in the statement of the Reporter. Upon a careful examination of it, we are satisfied that it does not sustain the bill, and for this reason, if for none other, relief should have been denied.

Decree affirmed.